Maria GOMBAR, Appellant,

v.

COMMONWEALTH of Pennsylvania, DE-
PARTMENT OF TRANSPORTATION,
BUREAU OF DRIVER LICENSING.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 2, 1996.
Decided June 21, 1996.

844

John F. Spirk, Jr., for Appellant.

Timothy P. Wile, Assistant Counsel In-Charge, and Harold H. Cramer, Assistant Chief Counsel, for Appellee.

Before COLINS, President Judge, FLAHERTY, J., and RODGERS, Senior Judge.

FLAHERTY, Judge.

Maria Gombar (Gombar) appeals from an order of the Court of Common Pleas of Northampton County (trial court) that dismissed her appeal from the Department of Transportation's (DOT) suspension of operating privileges for failure to submit to chemical testing, pursuant to Section 1547(b)(1) of the Vehicle Code (Code), 75 Pa.C.S. § 1547(b)(1).[1]

Gombar, a forty-three year old woman whose testimony was found credible by the trial court, came to this country from Czechoslovakia fifteen years ago. Gombar has been a licensed driver since her arrival in this country in 1981. Prior to the incident in question, Gombar had no previous driving violations but was the operator of a vehicle which was struck from the rear in February, 1987. As a result of the 1987 accident, Gombar experienced post-concussion syndrome, sustained marked confusion and forgetfulness, developed a terror for driving, experienced recurrent headaches, and suffered from ptosis, a persistent drooping of one eyelid. (Shaud deposition, pp. 8, 9.)

In March, 1987, Gombar sought and received psychiatric treatment for her fear of driving from Dr. Lawrence DeMilio (DeMilio), a psychiatrist.[2] Gombar testified that,

---

1. Section 1547(b)(1) of the Code provides:

    If any person placed under arrest for a violation of Section 3731 (relating to driving under the influence of alcohol or controlled substances) is requested to submit to chemical testing and refuses to do so, testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of twelve months.

2. DeMilio's report was introduced for the limited purpose of being relied upon as part of Gombar's medical history as received by Dr. Shaud. (N.T. p. 12, June 7, 1995 hearing; Shaud deposition, p. 9.) DeMilio diagnosed Gombar as suffering

even after she overcame her fear of driving, she would "have to stop and—stop on the side and just turn my flashlights on and just calm down" when she found herself in a stressful driving situation. (N.T. p. 4, July 7, 1995 hearing.) In 1989, Gombar sought treatment from a psychiatric therapist, Dr. William L. Shaud (Shaud), who rendered psychotherapeutic treatment to Gombar for over five years prior to the instant occurrence. As part of her therapy with Shaud, Gombar worked on her persistent driving anxiety which she continues to experience. (Shaud deposition, p. 6.)

Gombar testified that on January 16, 1994, the night in question, she had consumed one glass of wine with dinner and left home to get gas in her vehicle. (Findings of Fact Nos. 12, 13.)[3] Gombar lived only 2-½ miles from the scene. There was a high temperature of only 11 degrees that day and eight inches of snow and ice on the ground. (Findings of Fact No. 16.) Gombar recalled that the road was icy, that she had lost control of the car because of the ice and skidded off the right side of the road onto the shoulder into a snow bank. After the car had come to a stop, Gombar was shaken up but not physically injured. She started to walk home when a motorist stopped behind her and tried to prevent her from walking on the road because it was dangerous, slippery, and cars were going past her. Gombar testified that she did not remember being questioned by Trooper Mase or told the consequences of her refusal to submit to testing. In her words: "I was really all shooken up. All I remember telling everyone that I just want to go home ... everything that happened that night was like the accident I had before because even before I was telling the troopers and everything I just want to go home." (N.T. pp. 7–9, July 7, 1995 hearing.) Gombar testified that she believed the police would take her home if she signed the refusal form. Gombar signed the form and "they took me

home." (N.T. p. 9, July 7, 1995 hearing.) Gombar testified that she did not know what it meant to sign the refusal form. She was not cross-examined. The trial court found her testimony credible.

Thomas J. Mase (Trooper Mase), the arresting officer, a Pennsylvania State Trooper with ten months' experience, testified that he first came into contact with Gombar at approximately 9:10 p.m. on the evening of January 16, 1994. While on routine patrol on Airplane Road in Hanover Township, Trooper Mase noticed a vehicle on the side of the roadway and another vehicle parked in front of it, with its flashers activated. He observed Gombar walking away from the vehicle and a gentleman walking with her toward him. Trooper Mase spoke with the owner of the other vehicle, James King (King), who told Trooper Mase that he had been following Gombar's vehicle, saw her walking on and off the roadway after she stopped and assisted her for her own protection.

Trooper Mase found it difficult to speak with Gombar, who repeatedly told Trooper Mase that she wanted to go home. Trooper Mase testified that Gombar was trying to walk in the direction of her residence. Trooper Mase noticed that Gombar was breathing heavily—"it was like she'd pant real heavily." (N.T. p. 9, June 10, 1994 hearing.) Trooper Mase "noted a strong odor of alcoholic beverage on her breath due to the fact we were standing side by side talking, she was breathing very heavily." (N.T. p. 9, June 10, 1994 hearing.) Trooper Mase twice requested that Gombar perform field sobriety tests, which she refused. Trooper Mase testified that Gombar "kept on saying no, she didn't want to take them and she's trying to leave the entire night, she didn't want to be where she was." (N.T. p. 13, June 10, 1994 hearing.)

from phobia which manifested itself in ongoing symptoms of an abnormally high anxiety level when driving in certain traffic situations. DeMilio last saw Gombar on June 29, 1987, when he interrupted her systematic desensitization program even though it was only one-third completed due to her obtaining medical help for recurrent headaches. According to DeMilio's medical

notes, Gombar still experienced (as of June 29, 1987) ongoing episodes of extreme anxiety while driving. (R. 70a.)

3. There is no evidence in the record concerning the size of the glass of wine from which any inference can properly be made.

Trooper Mase thereafter placed Gombar under arrest for driving under the influence, and transported her to Muhlenburg Hospital to have a blood test performed. At the hospital, Trooper Mase, again, twice explained the consequences of refusing to submit to the testing. Gombar, again, just "wanted to go home." (N.T. p. 13, June 10, 1994 hearing.) Trooper Mase read the implied consent law and the refusal form to her, and she signed the refusal form. The trial court found the testimony of Trooper Mase credible.

Shaud testified [4] that Gombar still suffered from PTSD as a result of her 1987 car accident.[5] Shaud explained that PTSD involves recurring nightmares and flashbacks relating to the initial traumatic event that diminish over time. Specifically, Shaud testified that "any kind of accident such as she describes occurred in January of 1994, would create a flashback-like experience in which she would have somewhat of a diminished capacity to be aware of her surroundings and to participate in a process that might need to follow." (Shaud deposition, p. 15.)

Shaud's opinion "with a reasonable degree of scientific certainty" was that Gombar, on the night of her arrest, did not have full awareness of what was happening and did not have the ability to put into perspective the requests for testing made by the police. According to Shaud, Gombar went back in time and experienced a flashback, resulting in confusion which prevented her from having the capability to make a knowing and conscious refusal of testing. (Shaud deposition, pp. 15, 18.)

On cross-examination Shaud admitted that, although it was possible that the ingestion of a substantial or even a fair amount of alcohol could cause disorientation, confusion or dizziness in an individual, alcoholic consumption would not have produced increased stress in

Gombar's case but, on the contrary, would have made Gombar more comfortable with her 1994 accident because alcohol is a sedative drug that would make it less likely that she would be emotionally tense. (Shaud deposition, pp. 23, 24, 26.)

On redirect examination, Dr. Shaud described the effects of alcohol contributing to Gombar's inability to make a knowing and conscious refusal:

Q Now, finally, regarding the possibility of alcohol contributing to the ability to make a knowing and conscious refusal. And I am reading from an opinion from Judge Simpson.

If you knew, in addition to what Maria has told you, that she was seen wandering on and off the roadway after leaving her vehicle after the accident, that she told the trooper she had been driving to go get gas, that the trooper had difficulty communicating with her due to her irregular breathing, and that the trooper detected alcohol on her breath. If you knew those factors, would that cause you to change your opinion as to her inability to make a knowing and conscious refusal being caused by her distress disorder?

A No, it would not. Actually, the irregular breathing is one of those autonomic responses that I described, and that could not be explained by excessive ingestion of alcohol.

I would need to know a little bit more about what they are referring to by going on and off the road, but I think Maria should not have gotten in her car after that event. She was not a capable driver at that time. She was overwhelmed with—

Q Actually, it was walking on and off the road?

A She was walking?

Q Yes, that was the wandering?

---

**4.** The trial court received Shaud's qualifications and testimony, taken by deposition on June 10, 1994, into evidence without objection at the July 7, 1995 hearing.

**5.** Dr. Shaud, a specialist for the local Veterans Administration Hospital, described PTSD as a disorder from which Vietnam veterans and victims of accidents and domestic violence frequently suffer, and stated that he has treated over 300

persons for the symptoms of PTSD, which include:

Recurrent and intrusive distressing recollections of the events that interfere with ability to focus. Sudden acting or feeling as if the traumatic event were (again) occurring ... (Parenthetical insert added).

(Shaud deposition, pp. 16, 19.)

A    Okay.

Q    Tell me more about this irregular breathing, is that something that you would see in somebody who is experiencing post-traumatic stress?

A    Someone who is in the middle of a flashback, or a recurrent memory, or wakes up with a nightmare, experiences all these. Your blood pressure goes up, your respiration rates goes [sic] up, your heart rate goes up and you sweat. That is your body's response to fearful stimuli.

(Shaud deposition, pp. 30, 31.)

In its opinion, the trial court found that Shaud's testimony established that Gombar suffered from PTSD and that PTSD was responsible for her diminished capacity on the night of her arrest. (Trial court opinion, p. 9.). However, the trial court further held that no competent and unequivocal evidence existed to support the conclusion that Gombar's "conduct on the night of her arrest was not caused by intoxication." (Trial court opinion, p. 10.) The trial court concluded that Gombar failed to satisfy her burden of proving that her PTSD, rather than intoxication, played a greater role in her inability to knowingly and consciously refuse chemical testing. (Trial court opinion, pp. 10, 11.) [6]

■ DOT notified Gombar on February 15, 1994, that her operating privilege would be suspended for a one-year period commencing March 22, 1994. Gombar timely appealed the suspension to the trial court which, after a hearing, dismissed Gombar's appeal due to her refusal to submit to chemical testing. This appeal followed. [7]

■ To sustain a license suspension under Section 1547 of the Code, DOT has the burden of establishing that the driver (1) was arrested for drunken driving by a police officer who had reasonable grounds to believe that the motorist was operating, or actually controlling or operating the movement of a motor vehicle, while under the influence of alcohol; (2) was requested to submit to a chemical test; (3) refused to do so; and (4) was warned that refusal might result in a license suspension. *Vinansky v. Department of Transportation, Bureau of Driver Licensing*, 665 A.2d 860, 862 (Pa.Cmwlth.1995). Once DOT establishes these four elements, the burden shifts to the driver to prove, by competent evidence, that he or she was unable to knowingly and consciously refuse chemical testing. *McDonald v. Department of Transportation, Bureau of Driver Licensing*, 130 Pa.Cmwlth. 276, 567 A.2d 1127 (1989).

■ Where, as here, a driver has not sustained injuries creating an obvious inability to comply with a request for chemical testing, the burden of establishing such an incapacity must be shown by competent medical testimony, *Department of Transportation, Bureau of Driver Licensing v. Derhammer*, 118 Pa.Cmwlth. 364, 544 A.2d 1132 (1988), or other testimony as to specialized knowledge on a particular subject under investigation, where the experts do not exceed the scope of their experience in their respective fields. *Department of Transportation, Bureau of Driver Licensing v. Zeltins*, 150 Pa.Cmwlth. 44, 614 A.2d 349 (1992). However, if a motorist's inability to make a knowing and conscious refusal of testing is caused, in whole or in part, by the consumption of alcohol, the motorist's affirmative defense fails. *Plotts v. Department of Transportation, Bureau of Driver Licensing*, 660 A.2d 133 (Pa.Cmwlth.1995).

■ Whether a licensee satisfies the burden of showing an inability to make a knowing and conscious refusal of testing is a factual determination for the trial court to decide. *Department of Transportation, Bureau of Driver Licensing v. Grass*, 141 Pa.Cmwlth. 455, 595 A.2d 789 (1991). However, the issue

---

6. The trial court erroneously referred to the exclusion of *intoxication* rather than the actual amount of alcohol ingested, as the basis for its conclusions. The burden placed upon Gombar was not merely to exclude intoxication, but to exclude the effects of one glass of wine as a contributing factor in her inability to make a knowing and conscious refusal of testing.

7. Our standard of review in license suspension cases is limited to determining whether the trial court's findings are supported by competent evidence, or errors of law have been committed, or whether the trial court's decision demonstrates a manifest abuse of discretion. *Department of Transportation, Bureau of Driver Licensing v. Lello*, 132 Pa.Cmwlth. 11, 571 A.2d 562 (1990).

of whether or not the trial court's finding that a licensee has sustained her burden is supported by competent evidence is a question of law within the scope of this court's review. *Department of Transportation, Bureau of Driver Licensing v. Moss,* 146 Pa. Cmwlth. 330, 605 A.2d 1279 (1992), *petition for allowance of appeal denied,* 532 Pa. 648, 614 A.2d 1144 (1992).

It is undisputed that DOT has met its initial burden for sustaining Gombar's license suspension under Section 1547 of the Code. The issues presented in this appeal are (1) whether there is competent evidence to support the trial court's determination that Gombar failed to meet her burden of showing that her incapacity to make a knowing and conscious refusal was due to PTSD and not to her ingestion of alcohol, and (2) whether her ingestion of alcohol played a role, in whole or in part, in her inability to knowingly and consciously refuse to submit to chemical testing.

█ The trial court found that Gombar's car left the roadway several times before ultimately leaving the roadway and stopping. (Finding of Fact No. 3.) After reviewing the record, we disagree. Trooper Mase's testimony at the June 10, 1994 hearing at which he recalled King's out of court statements to him, does not contain a single reference to Gombar's car leaving the roadway several times and ultimately leaving the roadway and stopping. (N.T. pp. 4–15, June 10, 1994 hearing). There is no substantial evidence, therefore, to support such a finding. This finding is not harmless error, because the fact found, not of record, and not supported by any evidence, leads to the inadmissible prejudicial inference that Gombar's vehicle was "weaving" and apparently was at least partially responsible for influencing the trial court's belief of intoxication. This mistaken belief of intoxication on the part of the trial court further diverted attention from the only credible evidence of alcohol ingested— one glass of wine with dinner.

Further review of the record reveals that the trial court improperly relied upon King's out of court statements to Trooper Mase which, unfortunately, were converted to hearsay evidence to reinforce the trial court's

assessment conclusions regarding Gombar's intoxication. Initially, the trial court properly overruled Appellant's objection and admitted Trooper Mase's testimony as to *King's* out-of-court statement—that Gombar was *walking* away from her vehicle on and off the roadway—for the limited purpose of proving Trooper Mase's state of mind in forming reasonable grounds to suspect that Gombar was operating or in actual control of a motor vehicle while under the influence of alcohol. (N.T. p. 5, June 10, 1994 hearing.) However,· the trial court subsequently permitted King's admissible out-of-court statement justifying Trooper Mase's state of mind, which was not hearsay, to become hearsay when it treated that statement as evidence to prove the truth of the facts asserted, i.e., as some evidence of the effects of alcohol ingested resulting in intoxication.

█ The trial court further found as a fact: "Mr. King said that he was trying to prevent the Appellant from *wandering* on and off the road when Trooper Mase arrived." (Finding of Fact No. 3.) The accurate statement of King that Gombar was "walking on and off the roadway" is not substantial evidence or a fair inference of "wandering" under circumstances where the roadway was icy, eight inches of snow and ice were prevalent and cars were passing nearby, when the issue is the effect of alcohol ingestion which the trial court describes as intoxication. The trial court's finding that Gombar was "wandering" is not harmless when it apparently affected the trial court's state of mind to perceive "wandering" as further substantive evidence of intoxication. (See p. 7, supra.) Trooper Mase's state of mind that Gombar was walking on and off the roadway was magnified and transformed into inaccurate hearsay evidence that Gombar was "wandering" which ultimately led to the trial Court's conclusion that Gombar was intoxicated.

The trial court's prejudicial and erroneous conclusion of intoxication was ultimately compounded when it was subsequently permitted to be used as a fact in evidence in the hypothetical questions posed to Shaud. Although there was no testimony by anyone, including Trooper Mase, that Gombar was

intoxicated, somehow a glass of wine turned into a magnum of alcohol when the trial court drew inferences based on facts not of the record. If the wrong inferences are drawn from facts not of the record, such as, Gombar's vehicle leaving the roadway several times before ultimately stopping and that Gombar was wandering on and off the road and then these wrong inferences are combined with the facts of the record, i.e., Gombar smelled of alcohol, admitted to drinking one glass of wine, was breathing heavily, or panting and was disoriented, the conclusion of intoxication is hard to resist, even by a highly qualified factfinder such as the trial court.

As Judge Del Sole succinctly stated:

> It is true that an out-of-court statement offered to explain a course of conduct is not hearsay. *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980). 'This court has repeatedly upheld the introduction of out-of-court statements for the purpose of showing that based on information contained in the statements, the police followed a certain course of conduct that led to the defendant's arrest.' *Commonwealth v. Underwood,* 347 Pa.Super. 256, 259, 500 A.2d 820, 822 (1985). However, an out-of-court statement which is offered to prove its truth is hearsay and is generally inadmissable [sic] as evidence because the competency and veracity of the original speaker are not subject to examination.

*Commonwealth v. Carroll,* 355 Pa. Superior Ct. 569, 573, 513 A.2d 1069, 1071 (1986).

The instant case, as well as *Carroll,* are good examples of the dangers inherent in admitting out-of-court statements for the limited purpose of showing the police's state of mind in forming reasonable grounds for pursuing a particular course of conduct. Because such statements often do not stay limited to their original function but rather creep into the case disguised as an established piece of evidence, great care must be used with regard to admissible out-of-court statements.

Accordingly, the trial court's two findings (Finding of Fact Nos. 3 and 4)—(1) that Gombar's vehicle left the roadway several times before ultimately stopping, and (2) that Gombar was "wandering" on and off the road—constitute unsubstantiated findings which are not supported by competent evidence and cannot be relied upon for proof of the effects of the ingestion of alcohol, let alone proof of intoxication. Reliance upon these two findings to infer proof of the effect of alcohol or excess ingestion of alcohol, constituted error on the part of the trial court, especially since intoxication became the basis for the hypothetical question, the answer to which then became the basis for the conclusion that Gombar did not sustain her burden of proving that alcohol did not play any part in her inability to understand the consequences of the refusal to submit to the requested testing.

■ Gombar argues on appeal that the trial court's finding that her inability to make a knowing and conscious refusal could have been partly due to alcohol was reversible error because the trial court relied on Shaud's answer to a hypothetical question which assumed the fact of intoxication which was not in the record. We agree.

On cross-examination, Shaud was asked two hypothetical questions which forced him to assume that Gombar was intoxicated. The testimony consisted of:

[Question No. 1]

Q. Assuming these observations [of Trooper Mase] are true, could it be possible that her intoxication, or intoxicated condition could have impaired her ability to make a knowing and conscious refusal of the blood test that she was asked to submit to that night?

A. That is possible.

Q. That is possible?

A. Yes.

[Question No. 2]

Q. And, Mr. Shaud, can you state here today, with a reasonable degree of medical certainty, that Ms. Gombar's intoxication played no part in her alleged inability to make a knowing and conscious refusal?

Mr. Spirk: Objection, assuming that she was intoxicated.

A. Could you rephrase the question?

Q. Yes, assuming Ms. Gombar's intoxication, assuming that she was under the influence of alcohol.

A. Assuming that.

Q. Could you state with a reasonable degree of medical certainty, that that would have played no part at all in her ability to make a knowing and conscious refusal?

Mr. Spirk: You may answer the question, just note my objection for the record.

... (Colloquy of Counsel.)

A. Well, first of all, I can't offer you any medical testimony certainly because I am not a medical person.

But, I would think then that the disorientation could be partly due to alcohol, yes. Assuming that she had too much alcohol. (Shaud deposition, pp. 25–26–27.) (Shaud Deposition, p. 25, bracketed information added.)

■ Thus, the first question was responded to prior to the objection. It forced the expert to assume the fact of "intoxication or intoxicated condition," which was not based on matters which appear of record. However, even though there was no objection, we do not find this first hypothetical to be problematic because the answer to it was equivocal and the trial court did not rely on its answer.[8] The second question was almost the same as the previously unobjected to question but moved the scale from the realm of possibilities to the legally acceptable gauge of scientific certainty which was relied upon by the trial court. In fact, the trial court quoted and relied upon Shaud's response to the second objection to hypothetical as support for its conclusions. (Trial court opinion p. 10.)

■ We must agree with Gombar's objection to the second hypothetical question and the trial court's improper reliance upon its answer. Hypothetical questions must be based on matters which appear of record and on facts which are warranted by the evidence. Lamoreaux v. Workmen's Compensation Appeal Board (Celotex Corporation), 92 Pa.Cmwlth. 1, 497 A.2d 1388, 1390 (1985). The record does not contain a finding that Gombar was under the influence of alcohol or intoxicated, nor does it contain admissible evidence which would support or tend to establish without an opinion from a qualified witness that Gombar was intoxicated or under the influence of alcohol. The only evidence in the record regarding alcoholic consumption is Gombar's own admission to Trooper Mase of drinking one glass of wine with dinner,[9] Trooper Mase's observation of a strong odor of alcohol on Gombar's breath and her heavy breathing.[10] Trooper Mase was never asked to, and never did, give any expert opinion, equivocal or unequivocal, as to whether or not Gombar was intoxicated, driving under the influence or whether her ingestion of alcohol had any relationship to her refusal to submit to testing. The total admissible evidence relating to alcohol ingestion, standing alone, particularly after Appellee's counsel chose not to elicit an opinion from Trooper Mase that Gombar was intoxicated or under the influence, do not support or excuse the conduct of Appellee's counsel, as an attorney for the Commonwealth, when he injected, for the first time in the case, "intoxication" and "under the influence" as facts of record upon which to base the critical hypothetical question posed to Shaud in order to destroy Gombar's sustaining of her burden of proof. Unfortunately, in the rationale of its opinion, the trial court apparently succumbed to these inflammatory mischaracterizations and repeatedly referred to Gom-

8. Since Shaud's answer: "That is Possible" in response to the first hypothetical was equivocal, it is insufficient to establish that Gombar's inability to make a knowing and conscious refusal was due, in part, to her voluntary intoxication. *Department of Transportation, Bureau of Driving Licensing v. Wilhelm*, 156 Pa.Cmwlth. 24, 626 A.2d 660 (1993).

9. Gombar's and Trooper Mase's testimonies were found credible by the court. (Findings of Fact Nos. 11, 13.)

10. Shaud's uncontradicted testimony that "respiration rates elevate, sweating occurs. Heart Beat and respiration rates increase dramatic[ally]," was not discussed by the court as an explanation of Trooper Mase's observation that Gombar was breathing heavily even though both Gombar's and Shaud's testimonies were found credible and the trial court found as a fact that Gombar's disorientation was caused by PTSD. (Shaud deposition, p. 17.)

bar's "intoxication" even though it did not make a single finding of fact of intoxication among its many other findings of fact but drew unwarranted inferences from unsubstantiated findings which were hearsay. (Trial court opinion 2–5, 9, 19.) [11]

The trial court mistakenly relied on cases where there were conjectural or speculative medical opinions which did not exclude the ingestion of alcohol as a contributing cause of the refusal to submit to testing. *See Plotts, Moss, Grass.* The facts of this case are more analogous to those presented in *Zeltins.* Even though Zeltins had consumed one small cordial glass of creme de menthe, this court affirmed the trial court, which found Zeltins incapable of making a knowing and conscious refusal due to the effects of severe stress and antibiotic medication. In *Zeltins,* DOT unsuccessfully challenged the qualifications of Zeltins' expert witnesses, *Zeltins,* 614 A.2d at 354, whereas in Gombar's case, Dr. Shaud's qualifications were not questioned but rather were recognized by the trial court. (Findings of Fact No. 20.).

Gombar and Shaud, both of whom were found credible, did present substantial evidence, including an unequivocal opinion by Shaud, that it was Gombar's PTSD which made her incapable of making a knowing and conscious refusal to submit to chemical testing.

■ There is no substantial evidence nor sufficient facts in the record, particularly the absence of any opinion evidence, to support the trial court's conclusion that Gombar was intoxicated. One glass of wine, a strong odor of alcohol and heavy breathing, under the circumstances of this case, without any opinion evidence of intoxication, do not form a legally acceptable foundation to support an inference or conclusion of intoxication.[12]

Without Shaud's answer to the faulty hypothetical question, which was permitted after a proper objection, there is no competent evidence to support the trial court's conclusion that Gombar failed to satisfy her burden of proving that her PTSD, rather than her ingestion of alcohol, impaired her ability to knowingly and consciously refuse to submit to chemical testing, and her burden of proving that alcohol did not play any role in her inability to knowingly and consciously refuse to submit to chemical testing. (Trial court opinion, p. 10.)

Accordingly, we hold that the trial court erred in relying upon hearsay evidence, making and relying upon inaccurate findings of disoriented behavior, and relying upon Shaud's answer to a faulty hypothetical question to support its holding that Gombar failed to sustain her burden of proof that PTSD and not intoxication (or the ingestion of one glass of wine with dinner) prevented her from making a knowing and conscious refusal to submit to chemical testing.

We vacate the trial court's order because the trial court incorrectly relied upon findings which were based on facts not of record and upon expert testimony not supported by competent evidence. Accordingly, we remand the case for additional findings and proceedings consistent with this opinion.

### ORDER

NOW, June 21, 1996, the order of the Court of Common Pleas of Northampton County, No. 1994–C–2057, dated August 5, 1995, is vacated, and the case is remanded for additional findings and proceedings.

Jurisdiction relinquished.

RODGERS, Senior Judge, dissents.

---

11. Whether Gombar was intoxicated is not at issue here. The use of the words "intoxication" and "intoxicated" were significant, however, in that their repeated usage by the trial court in its opinion is an indication of its reliance upon the previously referred to facts not in evidence upon which important findings and conclusions, (as opposed to harmless error), were based. The proper standard used here by this court is emphasized by inserting the words "alcohol" or "ingestion of alcohol" to indicate the lesser de-

gree of proof of the proper facts to be examined in the determination of whether or not the person charged with refusal to submit to testing had sustained her burden of proof.

12. We do not rule, on the other hand, whether or not the same facts, standing alone, would, as a matter of law, be a legally acceptable foundation to support an opinion of intoxication even by a qualified witness since that is not an issue here.

RODGERS, Senior Judge, dissenting.

I respectfully dissent. The trial court correctly set forth the law with respect to the licensee's burden of proof in this statutory appeal from a license suspension imposed under 75 Pa.C.S § 1547. Once DOT has established a prima facie case to support a suspension, the burden shifts to the licensee to prove that she was unable to knowingly and consciously refuse chemical testing. *Plotts v. Department of Transportation, Bureau of Driver Licensing,* 660 A.2d 133 (Pa. Cmwlth.1995). Where the licensee has not sustained injuries creating an obvious inability to comply with a request to be tested, the licensee must establish an incapacity to make a knowing and conscious refusal by competent evidence. *Id.; Department of Transportation, Bureau of Driver Licensing v. Zeltins,* 150 Pa.Cmwlth. 44, 614 A.2d 349 (1992). Moreover, the licensee must establish that a condition unrelated to her consumption of alcohol caused her incapacity; if the licensee's incapacity is caused, in whole or in part, by her voluntary ingestion of alcohol, the incapacity defense must fail. *Plotts; Appeal of Cravener,* 135 Pa.Cmwlth. 480, 580 A.2d 1196 (1990); *Department of Transportation, Bureau of Driver Licensing v. Andrews,* 95 Pa.Cmwlth. 338, 505 A.2d 412 (1986).[1]

Whether a licensee meets her burden of proof is a question of fact to be decided by the trial court. *Plotts; Department of Transportation, Bureau of Driver Licensing v. Grass,* 141 Pa.Cmwlth. 455, 595 A.2d 789 (1991). Regardless of whether the quantity of alcohol ingested was a minimal or excessive amount, only the trial court has the authority to render a factual determination regarding the effects of the amount con-

sumed. In this case, the trial court found that the licensee established that post traumatic stress disorder[2] was responsible for her "diminished capacity" (Trial Court's Opinion, p. 9); however, the trial court was not persuaded that the consumption of alcohol played no role in the licensee's condition.

In holding that the licensee's incapacity was due solely to her post traumatic stress disorder and was not caused, in whole or in part, to her ingestion of one glass of wine, the majority exceeds this Court's authority by substituting its findings for those made by the trial court. *See Department of Transportation, Bureau of Traffic Safety v. Korchak,* 506 Pa. 52, 483 A.2d 1360 (1984). It is not for this Court, as an appellate court, to read into the record, weigh evidence and decide for itself a question which is properly left to the trial court as fact finder. *Department of Transportation, Bureau of Traffic Safety v. O'Connell,* 521 Pa. 242, 555 A.2d 873 (1989). Our scope of review in a license suspension case is limited to determining whether the trial court's findings of fact are supported by substantial evidence or whether the trial court committed an error of law or abused its discretion. *Id.*

I also disagree with the majority's inference that the trial court's use of the term "intoxication" reflects that a "conclusion of intoxication" was made by the trial court. The courts continue to use this word, perhaps inartfully, to mean an ingestion of some quantity of alcohol, rather than to mean that a specific condition has been established either medically or legally.[3] Because this Court has commonly used the term "intoxication" to mean "ingestion of alcohol," it is inappropriate to infer an additional signifi-

---

1. Note that DOT's burden of proof does not include proving that alcohol *was* a contributing factor to the licensee's asserted incapacity; once DOT establishes its prima facie case, the burden of proof as herein stated remains with the licensee.

2. The issue of whether a post traumatic stress disorder of the type described in this case establishes an incapacity to make a knowing and conscious refusal to comply with a request to be tested has not been raised by the commonwealth.

3. *Compare,* e.g., *Department of Transportation, Bureau of Driver Licensing v. Grass,* 141 Pa.

Cmwlth. 455, 595 A.2d 789 (1991), *Department of Transportation, Bureau of Traffic Safety v. Humphrey,* 136 Pa.Cmwlth. 515, 583 A.2d 868 (1990), and *Department of Transportation, Bureau of Driver Licensing v. Peck,* 132 Pa.Cmwlth. 509, 573 A.2d 645 (1990). Without reference to the specific quantity of alcohol consumed, in each case our court held that the licensee had the burden to prove that the licensee's "intoxication" did not contribute to the asserted incapacity to knowingly and consciously refuse chemical testing.

cance from the trial court's use of that term in this case.

Accordingly, I would affirm.