**PennDOT v. Kramer**

*Marc A. Werlinsky, assistant counsel,* for appellant.
*Michael B. Grasso,* for appellee.

CEPPARULO, *J.,* July 1, 2005—

## I. INTRODUCTION

The Commonwealth of Pennsylvania, Department of Transportation (PennDOT) has appealed from this court's April 26, 2005 order sustaining Stephanie L. Kramer's petition for appeal from a suspension of operating privilege and rescinding suspension of her driver's license. This opinion is filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## II. PROCEDURAL AND FACTUAL BACKGROUND

On December 5, 2004, Officer Michael Lubold of the Middletown Township Police Department was called to

the scene of a one-vehicle accident involving a vehicle operated by Stephanie Kramer. N.T., April 16, 2005 at 7. Upon arriving at the scene, the officer saw that the vehicle struck a telephone pole, snapping it in half, and went down an embankment into small trees and brush. *Id.* at 8. Kramer had telephoned her father after the accident occurred and her father arrived at the scene before the police or emergency personnel. *Id.* at 43-44. The officer spoke with Kramer, who had left the vehicle and was standing by the side of the road. *Id.* at 8. The officer noticed that Kramer was extremely upset, "crying uncontrollably at times," and that she exhibited signs of being under the influence of alcohol, including "a very strong odor of alcoholic beverage about her breath," slurring of words, a flushed face and bloodshot eyes. *Id.* at 8-9. Kramer had no recollection of how the accident occurred, nor could she tell the officer where she was coming from or where she was going. *Id.* Kramer was also unable to answer basic questions about the day of the week and the identity of the president of the United States. *Id.* at 21. When the rescue squad at the scene transported Kramer by ambulance to the hospital, the officer followed her to St. Mary Medical Center. *Id* at 10.

Once at the hospital, Officer Lubold again attempted to talk with Kramer, explaining to her that he was going to request a blood test based upon his observations. *Id.* Kramer remained upset and the officer testified that she began to refuse to cooperate. *Id.* at 11. She began to "scream and yell uncontrollably for her father," and, when the officer began reading the PennDOT chemical test warning form (Form DL-26), she became so distraught that the nursing staff and a doctor arrived to try to calm

her. *Id.* The officer was forced to cease reading the form after the first and part of the second paragraphs because Kramer's behavior was becoming disruptive, and she "completely ignored [Officer Lubold] the rest of the time and just yelled for her father." *Id.* at 12.[1] The officer estimated that it took a period of "several minutes" to read the portion of the form that was communicated to Kramer. *Id.* at 24. Kramer's father did not arrive at the hospital until approximately 10 minutes after the ambulance because he had driven back to his home first, which is located about six blocks from the scene of the accident. *Id.* at 47.

When Officer Lubold determined that he could not finish reading the form because of Kramer's continuous, hysterical requests to see her father, the officer "went and spoke to her father and explained to him what was going on." *Id.* at 53. Kramer's father then went into the back of the hospital to see Kramer. *Id.* Once Kramer's father was with her, she told the officer that she would take the test. *Id.* at 32. However, the officer informed Kramer's father that "it was too late to take the test." *Id.* at 42. After he obtained a search warrant, the officer eventually received the results of a blood test obtained from

---

1. The first paragraph of Form DL-26 reads as follows: "Please be advised that you are under arrest for driving under the influence of alcohol or controlled substance in violation of section 3802 of the Vehicle Code." The second paragraph reads: "I am requesting that you submit to a chemical test of Blood," and the word "blood" has been written in by Officer Lubold. Officer Lubold did not read the remaining two paragraphs of the form, which inform an arrestee that he or she will face a license suspension of one year for a refusal to submit to testing and that the arrestee has no right to consult an attorney or anyone else.

blood taken by the hospital for treatment purposes. *Id.* at 25.[2] A hearing was held before this court on April 13, 2005 and the matter was taken under advisement. On April 26, 2005, we issued an order sustaining Kramer's appeal and reinstating her driving privileges. PennDOT now appeals from that order.

## III. ISSUES

PennDOT raises five issues on appeal—(1) whether this court erred in sustaining Kramer's appeal where PennDOT satisfied its burden of proving "a valid suspension pursuant to 75 Pa.C.S. §1547(b) based upon her refusal to submit to chemical testing after being arrested by a police officer who had reasonable grounds to believe that she was in violation of 75 Pa.C.S. §3802"; (2) whether this court erred in sustaining Kramer's appeal "on grounds the officer failed to read the warnings from the form DL-26 in their entirety where Kramer's conduct frustrated the officer's attempt to read those warnings"; (3) whether this court erred in sustaining Kramer's appeal "where Kramer's conduct constituted a refusal"; (4) whether this court erred in sustaining Kramer's appeal "because she failed to meet her burden of proving, through unequivocal expert testimony, that her refusal of chemical testing was not knowing and conscious"; and (5) whether this court erred in sustaining Kramer's appeal "because she did not suffer from an obvious inability to take the requested chemical test or to make a

---

2. While the extent of Kramer's injuries were not placed on the record before this court, it is clear that she was involved in a serious accident and that blood was eventually drawn at the hospital in the course of treatment for injuries suffered in that accident.

knowing and conscious refusal of testing." See statement of matters complained of on appeal. In the interest of clarity, we have addressed all of the issues in one analysis.

## IV. ANALYSIS OF ISSUES

In cases where a licensee appeals suspension of his or her driving privilege for failure to submit to chemical testing, PennDOT has the initial burden of proving four elements—that "licensee was arrested for driving under the influence of alcohol, was requested to submit to a chemical test, refused to do so and was specifically warned that a refusal would result in the suspension of his operating privileges." *DiGiovanni v. PennDOT,* 717 A.2d 1125, 1126 (Pa. Commw. 1998). Regarding the arrest for DUI, the arrest must have been made by a "police officer who had reasonable grounds to believe that the motorist was operating, or actually controlling or operating the movement of a motor vehicle, while under the influence of alcohol." *Gombar v. PennDOT,* 678 A.2d 843, 847 (Pa. Commw. 1996). To prove that the licensee was requested to submit to chemical testing, "PennDOT's burden 'includes the burden of showing that the licensee was offered a meaningful opportunity to comply with section 1547.' " *Petrocsko v. PennDOT,* 745 A.2d 714, 716 (Pa. Commw. 2000) (citing *Conrad v. PennDOT,* 142 Pa. Commw. 642, 598 A.2d 336 (1991)).

Regarding the question of whether a refusal has taken place, the Commonwealth Court in *Hudson v. PennDOT,* 830 A.2d 594, 599 (Pa. Commw. 2003) stated that "[t]he issue of whether a motorist's conduct constitutes a re-

fusal to submit to chemical testing is a question of law to be determined based on the facts found by the trial court." (citations omitted) "[A] motorist's refusal to submit need not be expressed in words; rather, a motorist's conduct may demonstrate a refusal to submit to chemical testing." *Id.* The proper standard to apply in determining whether a licensee's conduct amounts to a refusal is that any conduct "substantially short of an unqualified and unequivocal assent to a request to submit to chemical testing is a refusal." *Warner v. PennDOT,* 723 A.2d 755, 756 (Pa. Commw. 1999). (citation omitted)

Finally, regarding adequate warning that a refusal will result in a license suspension, the court in *PennDOT v. Ingram,* 538 Pa. 236, 256, 648 A.2d 285, 294-95 (1994) held: "that a proper *O'Connell* warning must include the following information: first, a motorist must be informed that his driving privileges will be suspended for one year if he refuses chemical testing; second, the motorist must be informed that his *Miranda* rights do not apply to chemical testing. This is by no means a mantra that the police must recite like automatons. The subject matter, however, should be covered in warnings issued by the police." Form DL-26, which is provided to police officers by PennDOT to assist in giving appropriate warning of possible license suspension, states in pertinent part:

"It is my duty, as a police officer, to inform you that if you refuse to submit to the chemical test your operating privilege will be suspended for a period of one year. You have no right to speak to a lawyer, or anyone else, before taking the chemical test requested by the police officer, nor do you have a right to remain silent when asked by the police officer to submit to the chemical test. Unless

you agree to submit to the test requested by the police officer your conduct will be deemed to be a refusal and your operating privilege will be suspended for one year."

Thus, an officer is not required to read the words printed on Form DL-26 verbatim. However, an officer is required to communicate proper *O'Connell* warnings in some form to the arrested licensee (including the fact that a one-year license suspension will result from refusal to submit to chemical testing, and that there is no right to speak with an attorney). One method of giving these warnings is to read the language printed in paragraphs 3 and 4 of Form DL-26.

In the case sub judice, the burden of proof was initially on PennDOT. The record shows that Kramer was involved in a severe one-car accident and exhibited signs of intoxication at the scene. N.T. at 8-9. At the hospital, Officer Lubold read Kramer the first and second paragraphs of the DL-26 form, which informed Kramer that she was being arrested for DUI and that a blood test was being requested. *Id.* at 12. Thus, PennDOT met their burden with regard to the first element—that Kramer was arrested for driving under the influence of alcohol by an officer who had reasonable grounds to believe that Kramer had been driving under the influence.

As stated, PennDOT's burden of proving that a licensee was asked to submit to testing includes the burden of showing that the licensee was given a meaningful opportunity to take the test. Here, Officer Lubold testified that he spent only several minutes in his initial attempt to read the DL-26 form to Kramer. N.T. at 24. However, when Kramer's father appeared and Kramer became calm

enough to agree to the test, the officer indicated that it was "too late" and that his investigation was complete. *Id.* at 42. The officer also testified that Kramer was confused at the scene of the accident so that she was unable to answer simple questions asked by emergency personnel. *Id.* at 21. Further, the car accident in which Kramer was involved was severe enough to result in a utility pole being snapped in half. *Id.* at 8. Under these circumstances, allowing only a few minutes for a hysterical licensee to calm down and cooperate with blood testing does not amount to a meaningful opportunity to comply with the mandates of section 1547. Furthermore, refusing to allow cooperation with the test after the licensee calms down and agrees to cooperate on the grounds that the investigation is complete is not reasonable. Therefore, we find that Kramer was denied a meaningful opportunity to submit to chemical testing.

PennDOT also has the initial burden of proving that Kramer *refused* to submit to chemical testing after being given a reasonable opportunity to cooperate. Here, Kramer exhibited uncooperative behavior for several minutes, which the officer deemed to constitute a refusal. N.T. at 24-25, 53. Clearly, Kramer's initial conduct fell substantially short of an unqualified and unequivocal assent. However, the officer also testified that he was "still in the hospital" when he was approached by Kramer's father, who informed him that Kramer was calm and assenting to undergo testing. N.T. at 55. Therefore, it is not clear that Kramer refused the test at all times. In fact, this court found that Kramer did eventually assent to testing. See *id.* at 32, 41. Because Kramer refused to take the test *before* being given a meaningful opportunity to

submit, PennDOT failed to meet its burden of proving that Kramer refused *after* being afforded a meaningful opportunity to take the test. Rather, the record shows that Kramer agreed to testing after she calmed down.

Assuming, arguendo, that PennDOT had met its burden as to Kramer's refusal to submit to testing after being afforded a reasonable opportunity to cooperate, PennDOT did not meet the burden of showing that Kramer was informed that a refusal would result in a one-year license suspension. Officer Lubold testified that he read only the first and second paragraphs of the DL-26 form. N.T. at 12. These paragraphs only inform a licensee that he or she has been arrested for driving under the influence and that the officer is requesting a blood test. Officer Lubold did not read the third and fourth paragraphs, which would have informed Kramer that she was facing a one-year license suspension and that she had no right to consult an attorney. *Id.* There was no testimony to indicate that Officer Lubold ever informed Kramer about the license suspension or her right to seek legal advice in any fashion whatsoever. Therefore, we find that PennDOT did not meet its burden of proving that Kramer was informed that she would lose her license upon a refusal to submit to chemical testing.

PennDOT complains that Kramer's hysterical state prevented Officer Lubold from completing the warnings. See statement of matters complained of on appeal, para. 2. However, Officer Lubold himself testified that he spent only minutes attempting to effectively communicate the warnings to Kramer. N.T. at 24. Furthermore, Officer Lubold could have communicated the warnings to Kramer after she had calmed down and was prepared to

undergo testing. Rather than complete the warnings and obtain a blood sample when Kramer became calm, the officer informed Kramer that it was "too late." *Id.* at 42. Therefore, we find that Kramer's behavior was not so egregious as to prevent effective communication of the DL-26 warnings in any form, and that the officer had ample opportunity to give the warnings, particularly after Kramer's father arrived in the emergency room. Because Kramer's conduct did not prevent the officer from giving the warnings, and because the warnings were not in fact given, Kramer's appeal must be sustained.

PennDOT further complains that Kramer failed to uphold her burden of showing an obvious medical incapacity to submit to testing or, in the alternative, to provide expert testimony showing a non-obvious medical condition. See statement of matters complained of on appeal, paras. 4, 5. Once PennDOT has met its burden of proof with regard to the initial four elements of a chemical test refusal case, the burden shifts to the licensee to show incapacity to make a knowing and conscious refusal. See *Carlin v. PennDOT,* 739 A.2d 656 (Pa. Commw. 1999). Here, however, we have found that PennDOT did not meet its burden with regard to those four initial elements. Because PennDOT did not sustain its burden, the burden never shifted to Kramer and she was not required to provide expert testimony. Kramer's ability to make a knowing and conscious refusal is immaterial to our decision to sustain her appeal, which was based solely on PennDOT's failure to prove that Kramer refused testing and was adequately informed of the consequences of her refusal.

## V. CONCLUSION

The foregoing represents the reasons for this court's order of April 26, 2005.